**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 25-4028**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

TAMARCUS SHAQUAN ELLIS, a/k/a Mark B.,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  Louise W. Flanagan, District Judge.  (5:21-cr-00273-FL-1)

Argued:  March 17, 2026                                    Decided:  July 20, 2026

Before NIEMEYER, AGEE, and RICHARDSON, Circuit Judges.

Affirmed by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Agee joined.  Judge Richardson wrote a dissenting opinion.

**ARGUED:**  Joseph Edward Zeszotarski, Jr., GAMMON & ZESZOTARSKI, PLLC, Raleigh, North Carolina, for Appellant.  Lucy Partain Brown, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.  **ON BRIEF:**  W. Ellis Boyle, United States Attorney, David A. Bragdon, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

NIEMEYER, Circuit Judge:

During Tamarcus Ellis' four-day criminal trial on charges of drug trafficking, the district court partially closed the courtroom for a portion of one witness's testimony, believing that the witness was being intimidated by a person or persons in the gallery. Ellis objected and now contends on appeal that his conviction must be vacated due to a violation of his rights under the Public Trial Clause of the Sixth Amendment, which, he argues, is a structural error requiring a new trial.

We conclude that the closure was not trivial, as the government contends, and therefore that the partial closure indeed implicated the Sixth Amendment's Public Trial Clause. We also agree with Ellis that a violation of the Public Trial Clause is a structural error that would automatically require a new trial. But we conclude that in the circumstances of this case, where the closure was partial as to persons excluded and temporally limited, we apply a more relaxed test than that for a total closure of the courtroom. Applying this test, we conclude that the district court properly found a "substantial reason" for the partial closure, that the partial closure was no broader than necessary, and that there were no reasonable alternatives. Accordingly, we affirm.

I

The applicable principles are now well established. The Sixth Amendment guarantees that an accused in a criminal prosecution "shall enjoy the right to a . . . public trial." U.S. Const. amend. VI. This is a fundamental right that was prompted by the "traditional Anglo-American distrust for secret trials," which was informed by the abuse

2

of such practices during the Spanish Inquisition and in England's Star Chamber. *In re Oliver*, 333 U.S. 257, 268–69 (1948). The right "embodies a view of human nature, true as a general rule, that judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings." *Estes v. Texas*, 381 U.S. 532, 588 (1965) (Harlan, J., concurring). Indeed, "a presumption of openness inheres in the very nature of a criminal trial under our system of justice." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980) (plurality opinion). It serves particularly to promote values of having a fair trial, reminding prosecutors and judges of their responsibility to the accused, encouraging witnesses to come forward, and discouraging perjury. *See Waller v. Georgia,* 467 U.S. 39, 46 (1984). And thus the public trial right is understood to protect "the rights of the public at large, and the press, as well as the rights of the accused." *Weaver v. Massachusetts*, 582 U.S. 286, 299 (2017).

Reflecting the fundamental value of open courts, the Supreme Court has considered violations of the public trial right to be structural error, *see United States v. Gonzalez-Lopez*, 548 U.S. 140, 149 (2006), as such an error "infect[s] the entire trial process," *Brecht v. Abrahamson*, 507 U.S. 619, 630 (1993). Any structural error belongs to a "very limited class" of errors, *Johnson v. United States*, 520 U.S. 461, 468 (1997), that "necessarily render[s] a trial fundamentally unfair" and thereby automatically requires a new trial, *Rose v. Clark*, 478 U.S. 570, 577 (1986).

Nonetheless, the right to a public trial "is not absolute," and "trial judges have discretion to impose *reasonable limitations* on access to a trial when overriding interests . . . are likely to go unprotected if closure is not employed." *Bell v. Jarvis*,

3

236 F.3d 149, 165 (4th Cir. 2000) (en banc) (emphasis added) (citing *Waller*, 467 U.S. at 45). Before "the right to a public trial may give way" to the *total* closure of a courtroom, the Supreme Court requires that (1) the party seeking to close the hearing advance an *overriding interest* that is likely to be prejudiced, (2) the closure be *no broader* than necessary to protect that interest, (3) *reasonable alternatives* to closing the proceeding be considered by the trial court, and (4) *findings adequate* to support the closure be made by the trial court. *Id*. at 166 (citing *Waller*, 467 U.S. at 48); *see also United States v. Barronette*, 46 F.4th 177, 193 (4th Cir. 2022).

While the *Waller* test addresses the *total* closure of a courtroom — the exclusion of all persons except for the parties, lawyers, witnesses, and court personnel for the entire hearing — a less demanding test applies to *partial* closures, where not all members of the public are excluded or where an exclusion is temporally limited to a portion of the hearing or both. This reflects the obvious fact that the values protected by a public trial are partially served by the partially open courtroom. But a partial closure, nonetheless, may still undermine the values served by the public trial guarantee, as it is not difficult to imagine a situation in which excluding certain persons or closing a trial temporarily could still result in a compromise of the values of an open courtroom.

Recognizing that *partial* closures implicate a defendant's Sixth Amendment right, albeit to a lesser extent than does a total closure, we have joined nearly every other court of appeals in applying a modified, less stringent version of the *Waller* test to partial closures. *See United States v. Smith*, 117 F.4th 584, 597 (4th Cir. 2024), *cert. denied*, 146 S. Ct. 92 (2025); *see also Bucci v. United States*, 662 F.3d 18, 23 (1st Cir. 2011);

4

*Woods v. Kuhlmann*, 977 F.2d 74, 76 (2d Cir. 1992); *United States v. Girard*, __ F.4th __ , 2026 WL 1466305, at *3 (3d Cir. 2026); *United States v. Osborne*, 68 F.3d 94, 99 (5th Cir. 1995); *United States v. Simmons*, 797 F.3d 409, 414 (6th Cir. 2015); *United States v. Farmer*, 32 F.3d 369, 371–72 (8th Cir. 1994); *United States v. Sherlock*, 962 F.2d 1349, 1357 (9th Cir. 1989); *Nieto v. Sullivan*, 879 F.2d 743, 753 (10th Cir. 1989); *Douglas v. Wainwright*, 739 F.2d 531, 533 (11th Cir. 1984).

Under this less demanding version of the *Waller* test, "when a trial judge orders a partial, as opposed to a total, closure of a court proceeding at the request of one party, a '*substantial reason*' rather than *Waller*'s '*overriding interest*' will justify the closure, because a partial closure does not implicate the same secrecy and fairness concerns that a total closure does." *Barronette,* 46 F.4th at 191–92 (emphasis added) (cleaned up) (quoting *Farmer*, 32 F.3d at 371); *see also Smith*, 117 F.4th at 597. "Those narrower exclusions place a smaller burden on the interests protected by the public-trial right" than total closures. *Girard*, ___ F.4th at ___, 2026 WL 1466305, at 3 & n.2 (collecting cases). Nonetheless, when a partial closure is supported by a "substantial reason," we still apply the remaining three factors from the *Waller* test, determining whether "the closure [was] no broader than necessary to protect [the] interest," whether the trial court "consider[ed] reasonable alternatives to closing the proceeding," and whether it "ma[de] findings adequate to support the closure." *Smith*, 117 F.4th at 596–97 (quoting *Waller*, 467 U.S. at 48); *see also Simmons*, 797 F.3d at 414 ("All federal courts of appeals that have distinguished between partial closures and total closures modify the *Waller* test so that the 'overriding interest' requirement is replaced by requiring a showing of a 'substantial

5

reason' for a partial closure, *but the other three factors remain the same*" (emphasis added)).

## II

During the period from January through May 2021, Tamarcus Ellis was engaged in the trafficking of substantial amounts of methamphetamine in the Greensboro, North Carolina area. He was also allegedly involved in the murder, dismemberment , and burning of a woman who had been working as a confidential informant for the government by purchasing drugs from Ellis and others during the government's investigation. The drug-trafficking conduct was prosecuted in this case, and the murder is being prosecuted in state court.

After a four-day trial, Ellis was convicted of conspiracy to traffic in methamphetamine and in actual trafficking of the drug. During the trial, the government presented the testimony of seven witnesses, and Ellis presented six.

On the first day of trial, August 26, 2024, the government called Malcolm Russell as its second witness. Russell had also cooperated with the government during its investigation of Ellis by making controlled buys from Ellis and recording a telephone conversation, and Russell knew Ellis and his operations. On direct examination, the government asked Russell to explain his own involvement in drug dealing, his plea agreement requiring his cooperation, and his dealings with Ellis. After Russell testified for less than an hour, the court recessed for the day. At the conclusion of that day's testimony,

the district court told Russell's counsel that it "hope[d] [that Russell] will speak up a little bit tomorrow, project himself a little bit."

When court reconvened the next morning, at 9:00 a.m. on August 27, the district court advised counsel that the U.S. Marshals Service had reported a possible problem in the courtroom the previous day:

> THE COURT:  So I received an early morning phone call from a member of the Marshals Service relaying to me that certain court attendees yesterday had perceived that visitors, ostensibly on behalf of the defendant — and it's great that you have visitors; I'm not discouraging that at all.  But one or more of that group of individuals, while the witness that will be returning to the stand was testifying, clicked their teeth excessively in ways that could be perceived as signaling disagreement with the testimony being elicited.  So we certainly don't want that to affect or anything to affect the testimony of any witness in this courtroom.

The district court then made inquiries, first asking government's counsel if he had noticed the issue.  Counsel responded that he had "noticed that [Russell] was scared, and that his testimony was very different than when he was prepped two weeks ago."  Counsel explained further that he "was having to drag stuff out of him" and that he (counsel) "didn't understand what was going on until after we rested for the day [when] it came to [his] attention there were some issues with regard to potential intimidation."  Russell's counsel then stated that he had noticed similarly that Russell had "seemed a little off up there."  Further, Russell's counsel also explained that, when, before the morning session, he asked Russell "point blank" if he was "scared or anything," Russell "didn't really want to talk about it" and was "very quiet."

The district court then invited the Marshal to share what information he had received, and the Marshal explained:

I was alerted to my colleague . . . who was the one actually sitting behind the defendant. He made me aware that while he was sitting there and the inmate who was in custody was testifying, he kept hearing noises like clicking teeth, kind of acting as if what he was saying was lying. Every time the guy would say something, he would kind of pop his teeth, and he would rock back and forth in the pew behind him. And he was unclear if the gentleman who was testifying could see him or not. But it was enough to where he said he turned to the side and had to look at the gentleman who was in the gallery to make sure he knew he could hear him, and he was wanting him to stop doing that.

He's been working for about ten years. He knows kind of what this guy was probably trying to do, was at least letting him know he thought he was lying. I didn't get the indication he was trying to intimidate him, but he was certainly trying to get his attention while he was testifying.

The court then announced, "Well, what I am inclined to do is simply to go forward and finish this witness's testimony without anybody in the courtroom. And then we can open up the courtroom."

When the court asked Ellis' counsel if she had any objection, counsel responded that she had not heard the "clicking" of teeth and that to conclude the clicking was an "overt threat" was highly speculative. She then stated a "preference" for an open courtroom, arguing that Ellis is "constitutionally allowed to have that." Ellis' counsel then took particular issue with the exclusion of Ellis' family, stating "[t]he exclusion of his wife and daughter when they have not . . . been accused of doing anything inappropriate, we think would not be appropriate, to seal the courtroom completely for this witness to testify." The court accommodated Ellis' request and invited Ellis' wife and daughter into the courtroom to watch the proceedings. When the court asked counsel who else was waiting outside, Ellis' co-counsel replied, "[a]lso the stepfather." The court then said, "Let's keep everybody else out. It's kind of hard to cure the perception here. But when this witness is

8

done, I'll open up the courtroom and invite everybody else in, if there is an everybody else that wants to come in." Nonetheless, on the request of Ellis' counsel, the court also allowed counsel's parents in the courtroom.

Thus, when Russell's testimony resumed, the persons in the courtroom included Ellis' family members, defense counsel's parents, government and defense counsel, the court's administrative staff, courtroom security, and the members of the jury.

As Russell took the stand to finish his testimony, the court stated that "for the purposes of your testimony, I've limited the attendees to the courtroom. And so if you perceived any issues when you testified, any expressions coming back from the gallery, I don't think you'll see those people in here this morning." Russell then completed his testimony, which lasted about another hour.

At the conclusion of Russell's testimony, the district court asked the courtroom security officer, "I limited inclusion in the courtroom, and I just would like to note for the record, did that end up being disagreed with by any visitors on behalf of the defendant? Did anybody show up?" The officer replied, "No, not that I can say." At that point, the district court opened the doors of the courtroom for the remainder of the trial, stating, "Anybody can come in who wants to." The partial closure ended at 10:20 a.m.

After the jury convicted Ellis of conspiracy to traffic in drugs and drug trafficking, the district court sentenced him to 480 months' imprisonment.

From the district court's judgment dated January 18, 2025, Ellis filed this appeal, contending only that the district court's partial closure of the courtroom violated his Sixth Amendment right to a public trial, thus automatically requiring a new trial.

9

III

The closure in this case was partial as to the persons excluded and limited temporally to approximately one hour during the four-day trial.* The government thus contends that the closure was so trivial that we need not analyze it as a Sixth Amendment violation. It argues that trivial closures do not implicate the underlying purposes of the Sixth Amendment's public trial right guarantee and therefore do not require application of the *Waller* factors. *See Zornes v. Bolin*, 37 F.4th 1411, 1417 (8th Cir. 2022) (collecting cases).

To be sure, courts have ruled that partial closures that were brief and inadvertent are "trivial" and therefore do not implicate the Sixth Amendment. *See, e.g.*, *Peterson v. Williams*, 85 F.3d 39, 42–43 (2d Cir. 1996). They have also applied a "triviality" standard to trials where the courts excluded members of the public for administerial reasons such as seating capacity. *See, e.g.*, *United States v. Patton*, 502 F. App'x 139, 141–43 (3d Cir. 2012) (concluding alleged courtroom closure was trivial where trial court excluded the defendants' family members during voir dire due to seating capacity).

In *Peterson*, which the government argues is persuasive here, the Second Circuit explained that such a "triviality standard" looked to "whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant — whether

---

\* The transcript shows that the court began on August 27, 2024 at 8:58 a.m., Tr. 168, and recessed at 10:20 a.m., Tr. 215 — an 82-minute morning session covering 47 transcript pages. During that morning session, Russell began testifying with the courtroom partially closed at transcript page 181 and completed his testimony at transcript page 215, at which time the court recessed and then reopened the courtroom. Thus, of the 47 pages of transcript constituting the morning session, 34 pages were devoted to Russell's testimony, constituting 72 percent of the 47-page morning session and therefore representing 59 minutes of the total 82-minute session — slightly less than one hour.

10

otherwise innocent or guilty — of the protections conferred by the Sixth Amendment." 85 F.3d at 42. And to make that assessment, the court considered "the values furthered by the public trial guarantee," including "(1) to ensure a fair trial; (2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions; (3) to encourage witnesses to come forward; and (4) to discourage perjury." *Id.* at 43 (citing *Waller*, 467 U.S. at 46–47). Assessing the closure against those values, the court held that an inadvertent continuation of a proper courtroom closing, which lasted approximately 20 minutes, which none of the participants in the trial noticed at the time, and which was followed by a "helpful summation" of the closed testimony, was "too trivial" to amount to a violation of the Sixth Amendment. *Id.* at 44; *see also United States v. Perry*, 479 F.3d 885, 890–91 & 91n.5 (D.C. Cir. 2007) (applying *Peterson* to conclude that the exclusion of the defendant's eight-year-old son did not implicate the values served by the Sixth Amendment). Thus, "triviality" has been found when a closure was both "brief" and "inadvertent," thereby having a de minimis impact on the public trial values.

The closure here might have been sufficiently brief to fit the triviality model, but it was certainly not inadvertent, as was the case in *Peterson*. But more importantly, we cannot conclude that a deliberate, hour-long partial closure would categorically fail to implicate, to some meaningful extent, the values that are protected by the Sixth Amendment, as *Peterson* recognized. Moreover, the district court here did not perceive its closure that way. Indeed, the court undertook to justify its closure based on the given circumstances. And in addition, Ellis claimed at the time that his Sixth Amendment rights were being violated. These circumstances hardly satisfy the triviality standard.

11

Thus, we will treat the closure here as a *partial* closure, subject to the test generally recognized for such closures. *See Smith*, 117 F.4th at 596–97.

IV

Under the *Waller* test as modified for partial closures, a court may partially close a courtroom if (1) the party seeking to close the courtroom advances a *substantial reason* justifying the closure; (2) the closure is *no broader* than necessary; (3) *reasonable alternatives* to the closure were considered by the trial court; and (4) the court made *adequate findings* to support the closure. *See, e.g.*, *Smith*, 117 F.4th at 596–97.

As to the *first* factor, we must determine whether the closure was justified by a "substantial reason." The record here shows that the district court partially closed the courtroom to both maintain order and protect a testifying witness from potential intimidation. As the court explained, it had received a report from the U.S. Marshals Service that one or more visitors in the gallery were "clicking" their teeth excessively and were "rock[ing] back and forth in the pew" such that the conduct could be perceived as "signaling disagreement" with the testimony, and the court expressed concern that the behavior could "affect the testimony" of the witness. Indeed, when the witness took the stand after the signaling had allegedly occurred and the court had partially closed the courtroom, the court explained its concern to the witness, stating, "If you perceived any issues when you testified [yesterday], any expressions coming back from the gallery, I don't think you'll see those people in here this morning."

12

The court's justification for the partial closure thus fell within the heartland of what constitutes a "substantial reason" for the closure. Indeed, in *Barronette*, we recognized that "maintaining order" and "preventing witness intimidation" were "overriding interests" justifying even a total closure of the courtroom, which was a more demanding standard than the "substantial reason" standard. 46 F.4th at 193. Moreover, "numerous [other] courts . . . have upheld closure to protect testifying witnesses" from intimidation. *United States v. Addison*, 708 F.3d 1181, 1187–88 (10th Cir. 2013) (collecting cases and noting that "protecting the participants in a trial is an integral part of protecting the integrity of the trial itself").

Thus, we conclude that the partial closure was appropriately justified by a substantial reason, as required to satisfy the first factor of the test with respect to partial closures.

As to the *second* factor, we must determine whether the partial closure was no broader than necessary. In this case, the district court excluded members of the public potentially responsible for the intimidation but not those as to whom the court could be assured were not so involved. The court thus allowed family members of the defendant and family members of the defendant's counsel to remain, but closed the courtroom as to others. Moreover, the closure was limited temporally, lasting only an hour for the completion of a particular witness's testimony — the testimony that could have been subject to intimidation. The information that the court received was that "court attendees" "on behalf of the defendant" — "one or more of a group of individuals" — appeared to have been "signaling disagreement with the testimony being elicited." It would have been

13

impractical and perhaps impossible the next day to identify those specific persons, as they were unidentified members of the public. Moreover, the Marshal who had supplied the information was not in the courtroom the next day to identify anyone. Thus, the court reasonably observed:

> Let's keep everybody else out. It's kind of hard to cure the perception here. But when this witness is done, I'll open up the courtroom and invite everybody else in, if there is any everybody else that wants to come in.

In *Barronette*, we held that the partial reduction in the capacity of a courtroom was no broader than necessary and "tailored to serve the interest of security and preventing witness intimidation" where "many members of the public were still able to attend," and the jury, court personnel, attorneys and court reporter also remained in the courtroom. 46 F.4th at 194 (cleaned up). Similarly, here the district court's limitation on access was tailored to serve the interests of preventing witness intimidation, as the court permitted members of the public who were certainly not involved in the intimidation to remain in the courtroom. Moreover, in this case, there is no evidence that any member of the public was actually excluded from the courtroom. When the court security officer was asked by the court, "Did anybody show up?", the officer replied, "No, not that I can say."

In short, we conclude that the partial closure here was no broader than necessary to protect against potential disruption and witness intimidation in the circumstances.

As to the *third* factor, we must determine whether reasonable alternatives to closing the proceeding were available. When the district court was first confronted with the report of potential witness intimidation and disruption, it considered a total closure, explaining that it was "inclined to . . . finish this witness's testimony without anybody in the

14

courtroom." After hearing from both parties, however, as well as the Marshal on duty that day, the court accommodated Ellis' request to admit both his family and his counsel's family. The court thus considered both a total closure and then the alternative of a more selective closure. In doing so, the court also addressed the specific concern that "an accused [be] at the very least entitled to have his friends, relatives and counsel present, no matter with what offense they may be charged." *In re Oliver*, 333 U.S. at 271–72 (footnote omitted). In short, we conclude that the district court sufficiently satisfied this third factor.

Finally, as to the *fourth* factor, we must determine whether the district court made adequate findings. This factor is designed to ensure that we can, on review, "determine whether the closure order was properly entered." *Waller*, 467 U.S. at 45 (quoting *Press-Enter. Co. v. Superior Ct. of Cal.*, 464 US. 501, 510 (1984)).

To be sure, the district court did not in a single iteration or in a formal manner make findings of fact regarding potential witness intimidation and the limited closure. Nonetheless, we conclude that the court expressed the basis of its conclusions during the course of the process sufficiently to inform us of its reasoning and enable us to review its decision.

After receiving specific information from the U.S. Marshals Service that persons in the gallery were apparently signaling disagreement with the witness's testimony, the court made inquiries of both parties. During those inquiries, the government confirmed to the court that the witness had seemed "scared" and that "his testimony was very different than when he was prepped two weeks ago." And Ellis' own counsel stated, "I'm not doubting something was observed," but she asserted that she did not hear any "clicking." The

15

witness's counsel, however, confirmed the government's observation. He confirmed more particularly that the witness had seemed "a little off up there" and stated that when he had spoken with the witness before court that morning, the witness was very quiet, prompting counsel to ask the witness "point blank," "Are you scared or anything?" The witness simply did not want to talk about it. And when the court made a further inquiry to the Marshal who had relayed his colleague's observations from the previous day, the Marshal went into further detail, describing how the person or persons "clicked" their teeth or "popped his teeth . . . and rolled back and forth in the pew." In response to these facts — statements from the Marshal, government's counsel, defense counsel, and the witness's counsel, which the court accepted — the court announced:

> Okay. Well what I am inclined to do is simply to go forward and finish this witness's testimony without anybody in the courtroom. And then we can open up the courtroom.

In sum, prior to closing the courtroom, the district court sought the views of all persons involved having information, and by hearing and accepting the multiple perspectives, the court supported its decision with findings sufficient to allow us to determine whether the closure was appropriate.

Moreover, the record shows that both the district court and the parties at the time of the closure were aware of allegations that Ellis, during the course of his drug trafficking activities, had been involved in the murder of another government informant to silence her. Although the court did not reference that fact, it highlights the appropriateness of the court's concern.

\*    \*    \*

16

At bottom, we conclude that the district court's partial closure for an hour during this four-day trial was justified under the modified *Waller* framework for partial courtroom closures.  Accordingly, we hold that the closure did not violate Ellis' Sixth Amendment right to a public trial.

AFFIRMED

RICHARDSON, Circuit Judge, dissenting:

The district court closed its courtroom to the public during the testimony of the government's cooperating witness. It found no fact. It never found intimidation likely absent closure. And it never considered a single measure short of closure. Instead, acting on a secondhand report that a single unidentified spectator had clicked his teeth during the cooperator's earlier testimony, the court barred the public from the rest of the witness's direct examination and the whole of his cross-examination. The Sixth Amendment's public-trial guarantee does not permit that shortcut.

But does that violation matter? The evidence supporting Tamarcus Ellis's federal drug-trafficking conviction was overwhelming. And Ellis is a bad man: A state-court jury later convicted him of murdering and dismembering the body of a woman who served as an informant for law enforcement. But neither the strength of the evidence nor Ellis's character can make this preserved error harmless. The denial of a public trial is structural error. So even a defendant like Ellis receives a new trial when that right is violated. I would vacate his conviction.

Despite our ultimate disagreement, I agree with much of my friend's opinion for the Court. We cannot ignore the closure on the theory that it was trivial, and the Majority rightly says so.[1] And the Majority agrees that a violation of the public-trial right is

---

[1] I need not resolve whether some *de minimis* exception to the Sixth Amendment's public-trial right exists—*but cf. Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 240, 244–51 (4th Cir. 2024) (en banc) (Richardson, J., dissenting)—or whether the so-called triviality doctrine instead marks the class of routine courtroom-decorum measures that never implicate the right in the first place. *See Bell v. Evatt*, 72 F.3d 421, 433 (4th Cir. (Continued)

structural, demanding reversal when the error is preserved on direct review. I also take no issue here with the Majority's description of the Supreme Court's test from *Waller v. Georgia*, 467 U.S. 39, 48 (1984): Closing a courtroom demands that a sufficient interest be shown to be genuinely at risk, that the closure be no broader than necessary, that the district court consider reasonable alternatives to closing the proceeding, and that it make findings adequate to support the closure. Our disagreement is narrow. It is whether the court's closure here survived that test. It did not.

## I.    BACKGROUND

Tamarcus Ellis stood trial on federal drug-distribution and conspiracy charges arising partly from the sale of methamphetamine to a confidential informant, Heather Stewart. [J.A. 1433] Before trial, the government informed the district court that Stewart had been murdered—her burned, dismembered torso was left outside a Goldsboro, North Carolina home—and that the State had charged Ellis with that killing. [J.A. 1172, 1434, 1441; S.A. 18–19; J.A. 504–06] After his federal drug-trafficking case, Ellis was convicted in state court of murder and concealment of murder.

On the first afternoon of Ellis's trial, the government called Malcolm Russell, a cooperating defendant who testified that he had bought a kilogram of methamphetamine from Ellis and interpreted a recorded call between the two as drug-related. [J.A. 132, 138–

---

1995) ("[A] defendant's right to a public trial is not implicated by temporary limitation of ingress and egress to the courtroom to prevent disturbance of the proceedings."); *see also Snyder v. Coiner*, 510 F.2d 224, 230 (4th Cir. 1975) (holding that a bailiff's temporary refusal to allow people in or out of the courtroom "was entirely too trivial to amount to a constitutional deprivation").

19

59] Russell was soft-spoken on the stand. But no one that day attributed his demeanor to intimidation. When court recessed, the district court remarked only that it "hope[d] [Russell] will speak up a little bit tomorrow, project himself a little bit." J.A. 161. No one—not the court, the government, Russell's own attorney, nor the Marshals—said a word about intimidation.

The next morning, in a closed courtroom, the district court reported "an early morning phone call from a member of the Marshal's Service relaying" that "certain court attendees yesterday had perceived that visitors, ostensibly on behalf of the defendant," had "clicked their teeth excessively in ways that could be perceived as [signaling] disagreement with the testimony being elicited." J.A. 198.

The court then heard from three sources, none of whom had firsthand knowledge of intimidation. The prosecutor said Russell "was scared, and his testimony was very different than when he was prepped two weeks ago," but conceded that he "didn't understand what was going on until after we rested for the day," when "it came to [his] attention there were some issues with regard to potential intimidation." J.A. 198–99. Russell's attorney said his client "seemed a little off up there," that he had asked Russell "point blank: Are you scared or anything?" and that Russell "just didn't really want to talk about it or get into it." J.A. 199–200. Deputy Marshal Ryan relayed what his colleague, Deputy Goodwin—who did not address the court—had observed: A man in the gallery would "pop his teeth" and "rock back and forth in the pew" when Russell testified, though Goodwin "was unclear if the gentleman who was testifying could see him or not." J.A. 200–01. Deputy Ryan then volunteered his own assessment: "I didn't get the indication

20

he was trying to intimidate him, but he was certainly trying to get his attention while he was testifying." J.A. 201. The district court itself acknowledged that it "really couldn't . . . hear what was going on." J.A. 200.

Even so, the district court announced that it was "inclined . . . simply to go forward and finish this witness's testimony without anybody in the courtroom." J.A. 201. Defense counsel objected. She noted that counsel table, seated "right in front" of the gallery, "did not hear any clicking"; that nothing makes teeth-clicking "an overt threat or known to be a way to intimidate people"; that the court's inclination to close the courtroom baked in "a lot of speculation"; and that "[the] preference in trials is always for an open courtroom for the defendant." J.A. 201–02. She specifically objected to excluding Ellis's wife and daughter, and offered an innocent explanation for Russell's demeanor: "[A]ny difference in his testimony is because he's under oath now." J.A. 203.

The district court sent co-counsel to retrieve the wife and daughter from the hallway. When co-counsel returned with them and reported that Ellis's stepfather was also present, the court ordered: "Let's keep everybody else out. It's kind of hard to cure the perception here. But when this witness is done, I'll open up the courtroom and invite everybody else in, if there is an everybody else that wants to come in." J.A. 203. Whether the order permitted or excluded Ellis's stepfather is genuinely unclear from the record, and the parties dispute it. *Compare* Response Br. 19–20, *with* Reply Br. 12–14. What is clear is that the order swept out at least two identifiable members of the public: defense counsel's parents, who had entered the courtroom that morning, were removed, and were readmitted later, only after counsel asked to have them readmitted at a sidebar. As the court put it,

21

"Apparently I kicked out the parents of our esteemed lawyer. Would you kindly invite them back in?" J.A. 206.

Before Russell resumed his testimony, the district court told him: "[F]or purposes of your testimony, I've limited the attendees to the courtroom. And so if you perceived any issues when you testified, any expressions coming back from the gallery, I don't think you'll see those people in here this morning." J.A. 204. The court did not know who "those people" might have been; it made no effort to identify the spectator that Deputy Goodwin had described, to determine whether he was present that morning, or to caution the gallery. Nor did it ever ask Russell—the only person who could say—whether he had perceived anything at all.

With the public excluded, Russell completed his direct examination and his entire cross-examination. The closure spanned roughly an hour of the trial day. *See* Majority Op. at 10 n.*.

When Russell stepped down, the district court asked the courtroom security officer, "[D]id [the limitation] end up being disagreed with by any visitors on behalf of the defendant? Did anybody show up?" The officer answered, "No, not that I can say," and the doors were reopened for the rest of trial. J.A. 246.

The jury convicted Ellis of the drug counts but acquitted him of a related firearm count. [J.A. 1090] The court later imposed a 480-month sentence. [J.A. 1378]

## II.    DISCUSSION

Start with what the government did not argue: It never argued that the closure satisfied *Waller*—the test the Majority applies today. On appeal, it pressed one theory

22

alone: that the closure was too *trivial* to implicate the Sixth Amendment. I don't doubt that we may affirm on any ground the record supports, and whether the closure satisfied *Waller* was squarely raised, albeit by *Ellis's* opening brief. But the government's failure to even address a straightforward argument raised by the appellant based directly on a binding Supreme Court test is telling.[2]

As the Majority and I agree that the government's lone argument fails, I part ways with my good friends on only one question: whether this closure survived *Waller*. It did not. The right to an open courtroom "may give way in certain cases to other rights or interests," but "[s]uch circumstances will be rare . . . and the balance of interests must be struck with special care." *Waller*, 467 U.S. at 45. *Waller* thus requires four things: (1) "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced," (2) "the closure must be no broader than necessary to protect that interest," (3) "the trial court must consider reasonable alternatives to closing the proceeding," and (4) "it must make findings adequate to support the closure." *Id.* at 48.[3]

---

[2] As the appellee, the government was free to defend the judgment on any ground that the record supports. *United States v. Am. Ry. Express Co.*, 265 U.S. 425, 435 (1924); *Blum v. Bacon*, 457 U.S. 132, 137 n.5 (1982). But its choice to go all-in on triviality and not brief *Waller* does not limit our ability to decide this case under *Waller*. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991). At the same time, the government's silence is not a confession of error—we must be convinced that the closure violated Ellis's public-trial right. *Cf. Sibron v. New York*, 392 U.S. 40, 58 (1968) (even an express confession of error does not "relieve this Court of the performance of the judicial function") (quoting *Young v. United States*, 315 U.S. 257, 258 (1942)); Fed. R. App. P. 31(c) (an appellee who fails to brief loses argument rights, not the judgment).

[3] When a closure is "partial" rather than total, we have relaxed the first requirement—a "substantial reason" will do in place of an "overriding interest"—but the (Continued)

23

**A.**

Here, the first prong is unsatisfied.  To be sure, preventing witness intimidation and maintaining order are, in the abstract, interests that can justify limiting courtroom access.  *See Barronette*, 46 F.4th at 193.  But *Waller* does not ask merely whether the trial court could have invoked a valid category of interest; it asks whether that interest was shown to be "likely to be prejudiced" in the case at hand.  467 U.S. at 48.  It requires specificity and substantiation.  The concern must be "concrete," and "the particular interest, and threat to that interest, must 'be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.'"  *Presley v. Georgia*, 558 U.S. 209, 215 (2010) (per curiam) (quoting *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 (1984)).[4]  A "conclusory assertion" will not do.  *Id.* at 216 (quoting *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 15 (1986)).

---

relaxation ends there.  *United States v. Barronette*, 46 F.4th 177, 191–93 (4th Cir. 2022); *United States v. Smith*, 117 F.4th 584, 596–600 & n.12 (4th Cir. 2024) (evaluating the "trial court's implementation of the COVID-19 Protocol—which involved closing the trial courtroom to the public and streaming a video feed of the trial proceedings into the public viewing courtroom"—as a partial closing).  Whether the district court's closure should be analyzed under a relaxed first-prong standard at all is a serious question.  But I need not address it, because this closure fails even the more forgiving test.  So I will assume, as the Court holds, that the presence of a "substantial reason" here would satisfy *Waller*'s first prong.

[4] In a sense, the Supreme Court here combines the first and fourth prongs.  The first demands a particular "interest that is likely to be prejudiced" while the fourth requires the district court to "articulate" that interest along with "findings specific enough" for review.  *Presley*, 558 U.S. at 214–15 (cleaned up); *see also Waller*, 467 U.S. at 48 (noting that generically stated interests can "result" in district court findings that are too "broad and general" to justify closure).

Measured against that standard, the record here does not establish that witness intimidation was a real and present threat. A "generic risk . . . unsubstantiated by any specific threat or incident" is not enough. *Presley*, 558 U.S. at 215. If anything, the record establishes that everyone in the courtroom was *unsure* about whether Russell was intimidated. The only account of the spectator's conduct came secondhand via Deputy Marshal Ryan, who relayed what Deputy Goodwin had told him. According to Deputy Ryan, Deputy Goodwin himself "was unclear if [Russell] could see [the spectator] or not." J.A. 200–01. And Deputy Ryan's own bottom line disclaimed the very premise on which the closure rested: "I didn't get the indication he was trying to intimidate him." J.A. 201. No one at counsel table, seated directly in front of the gallery, heard anything. J.A. 201. And the one person who could have said whether he perceived a threat—Russell—was never questioned by the court. *Cf. Guzman v. Scully*, 80 F.3d 772, 775–76 (2d Cir. 1996) (finding a public-trial-right violation where the trial court never asked the witness "whether he in fact felt intimidated" or "whether his fear, if genuinely held, was sufficiently well-founded").

What remains, then, is an inference of intimidation stacked on a questionable characterization. That will not do. The prosecutor and Russell's attorney told the court that Russell had seemed "scared" and "a little off." J.A. 198–99. The district court described Russell merely as a witness who needed to "speak up a little bit tomorrow, project himself a little bit," J.A. 161, and the government reported only that the day had "slowed down a little bit," J.A. 165. The prosecutor conceded he "didn't understand what was going on until after [they] rested for the day," when the intimidation theory was suggested to him.

25

J.A. 198–99. Only after the Marshal's early-morning phone call did a quiet witness become an intimidated one. In the face of all this uncertainty, the court inferred that the cooperator's demeanor on the stand was a result of spectator intimidation.[5] But if we are to make our own inferences, no prosecutor who has handled cooperating witnesses at trial would be surprised that a previously emphatic cooperator gets squirrelly once on the witness stand in a public trial.[6]

The Majority leans on the allegation—later proved in state court—that Ellis murdered and dismembered informant Heather Stewart, acknowledging that the district court "did not reference that fact" but reasoning that "it highlights the appropriateness of the court's concern." Majority Op. at 16. It's true that we often infer a rationale or supplement a district court's stated reasons. *See, e.g.*, *United States v. Ferguson*, 140 F.4th 538, 546 (4th Cir. 2025). But sometimes the law demands that the district court show its work. An injunction must "state the reasons why it issued." Fed. R. Civ. P. 65(d)(1)(A). A sentence must come with an explanation adequate for review. *See United States v.*

---

[5] The Sixth Circuit confronted something similar in *United States v. Simmons*. There, the prosecutor told the court that a cooperating witness "might be intimidated" by three of the defendant's co-defendants seated in the gallery, and the court excluded them. 797 F.3d 409, 411–12 (6th Cir. 2015). The Sixth Circuit held that the district court committed a *Waller* error—thus requiring a new trial—because it "asked no questions at all" to verify the concern and never properly found that the asserted interest was actually at risk. *Id.* at 414–16. The same is true here, except that here, the inquiry the court *did* conduct *undercut* the intimidation theory. *See* J.A. 201 ("I didn't get the indication he was trying to intimidate him.").

[6] Indeed, Ellis's counsel offered a version of this alternative explanation for Russell's behavior: "[A]ny difference in his testimony is because he's under oath now. It's a lot bigger deal to get up there and lie." J.A. 202–03.

*Torres-Reyes*, 952 F.3d 147, 151 (4th Cir. 2020). And a closure order sits in the same category: The district court itself must articulate the interest, the threat to it, and findings specific enough for review. *Presley*, 558 U.S. at 215. We ask whether the district court's *stated reasons* justified its order—not whether reasons we imagine might have. Measured that way, the obligation went unmet. The district court articulated neither a substantial interest likely to be prejudiced absent closure nor specific findings supporting closure.

That should end the matter. *See Waller*, 467 U.S. at 49 n.8 (rejecting an appellate "post hoc assertion" that attempted to "satisfy the deficiencies in the trial court's record"). But beyond looking past the district court's stated rationale, the Majority presupposes a record supporting the district court's unstated one. This record undercuts it: The only marshal who spoke to the court disclaimed any indication of intimidation, and the one person who could have confirmed the theory—Russell—was never asked. Nor does Stewart's murder fill the gap. The district court never mentioned it. A fact the court never invoked cannot supply the findings it never made—still less overcome a record that points the other way.

## B.

Even indulging the premise that a substantial reason was present, articulated, and supported by specific findings, the closure was broader than necessary and thus also fails *Waller*'s second prong. *Waller*, 467 U.S. at 48. The reported problem was one man: a single spectator who, by Deputy Goodwin's account relayed secondhand through Deputy Ryan, clicked his teeth and rocked in his pew. [J.A. 200–01] The tailored response would have addressed that man (or explained why that could not be done). Instead, the district

27

court announced a categorical rule—"Let's keep everybody else out"—and then made exceptions for Ellis's wife and daughter and, later, counsel's parents. Contrast *Barronette*, where the necessary tailoring was apparent: a capacity limit set with courthouse security and defense counsel, members of the public still in the courtroom, and a live audio feed to an overflow room.[7] *See* 46 F.4th at 194. Here, the excluded public received nothing. And as in *Presley*, "[n]othing in the record shows that the trial court could not have accommodated the public." 558 U.S. at 215.

The Majority contends that identifying the offending spectator "would have been impractical and perhaps impossible," because he was an unidentified member of the public and the Marshal who supplied the information "was not in the courtroom the next day to identify anyone." Majority Op. at 13. But the Majority's contention finds no support in the district court's remarks and nothing in the record shows that the court asked whether Deputy Goodwin was available, or that identification was ever attempted and failed.

Nor can the Majority shore up this prong with its observation that "there is no evidence that any member of the public was actually excluded." Majority Op. at 14. Even if true,[8] this fact cannot save the order. The violation lies in the unjustified order, not in

---

[7] The tailoring is also apparent in light of the specific security concerns the district court in *Barronette* cited, which "include[ed] fights in the gallery, knives being found in the gallery, a table in the lobby of the courtroom being vandalized . . . the fact that government witnesses in the case had been murdered, and an alleged request" from the defendant "for people to pack the courtroom when government witnesses were testifying." 46 F.4th at 188.

[8] From the record, counsel's parents were excluded pursuant to the order (though allowed to return); on Ellis's account, his stepfather was kept out as well; and the courtroom security officer hedged his answer—"No, not that I can say," J.A. 246—as to whether anyone else was turned away.

Ellis's ability to provide a headcount of the spectators it turned away. So a defendant who invokes the constitutional guarantee of a public trial need not prove that anyone was actually removed or sought admittance. *See Waller*, 467 U.S. at 49 n.8; *Weaver v. Massachusetts*, 582 U.S. 286, 296 (2017). Even if the district court's closure had no effect—that is, even if it were harmless—the error remains a structural one and thus requires retrial.

**C.**

The Majority's analysis also goes awry at *Waller*'s third prong. Trial courts bear an affirmative obligation "to consider alternatives to closure even when they are not offered by the parties," and are "obligated to take every reasonable measure to accommodate public attendance at criminal trials." *Presley*, 558 U.S. at 214–15. And, in conjunction with the fourth prong, the district court must "articulate" the considered alternatives along with "findings specific enough" for review. *See id.* at 215; *Press-Enterprise Co.*, 464 U.S. at 513.

Here, the record reflects no consideration of any alternative to closure. Upon hearing the Marshal's report, the court moved in a single breath to exclusion: "Well, what I am inclined to do is simply to go forward and finish this witness's testimony without anybody in the courtroom." J.A. 201. Between report and ruling, no alternative was weighed. None was rejected. None was even mentioned. But non-burdensome alternatives should have been obvious. The court could have admonished the gallery that signaling of any kind toward the witness would result in immediate removal. It could have attempted to identify or confirm the presence of the single offending spectator. It could

29

have stationed a marshal in the gallery. But the district court mentioned *none* of these measures and—*a fortiori*—failed to adequately explain the insufficiency of any of them.

The Majority reasons that the third prong is satisfied because the district court "considered both a total closure and then the alternative of a more selective closure." Majority Op. at 15. That conflates the district court's obligation to tailor the closure with its independent obligation to consider alternatives *to closure*. *Waller*'s third prong requires the court to consider "reasonable alternatives *to closing the proceeding*," 467 U.S. at 48 (emphasis added)—measures short of a closure, whether partial or total—not to deliberate among gradations of closure. On the Majority's logic, a trial court could always satisfy the third prong by announcing a maximal closure and bargaining downward. But that method is contrary to the Supreme Court's commands in *Waller* and *Presley*.

The government might have responded that our own precedent excuses the district court's failure. In *Bell v. Jarvis*, we said that once a trial judge settles on a limited closure as the alternative to a total one, *Waller* does not oblige him "to invent and reject alternatives to the proposed closure." 236 F.3d 149, 169 (4th Cir. 2000) (en banc) (endorsing *Ayala v. Speckard*, 131 F.3d 62, 71 (2d Cir. 1997) (en banc)). But *Jarvis* cannot save the closure here, for two reasons. First, *Jarvis* was a federal habeas review of a state conviction. Thus, we held merely that the state court's decision was not "unreasonable" under § 2254(d), reviewing only the result, "not whether the state court decision is well reasoned." *Id.* at 159 (cleaned up). That is a ceiling on relief, not a statement of what *Waller* demands on the *de novo* direct review we conduct today. Second, and dispositively, *Presley* came ten years after *Jarvis*, and it holds—as a command, not a courtesy—that "trial courts are

30

required to consider alternatives to closure even when they are not offered by the parties." 558 U.S. at 214.  Whatever the *Jarvis*/*Ayala* gloss once suggested, *Presley* settles it. Because the district court considered nothing, it failed to satisfy this prong.

**D.**

Finally, as I've detailed in discussing the first three *Waller* prongs, the district court ignored *Waller*'s command to "make findings adequate to support the closure."  *Waller*, 467 U.S. at 48.  The problem is not form; it is substance.  The district court didn't find that the spectator's conduct actually constituted intimidation.  It didn't find that Russell saw or heard the conduct.  It didn't find that Russell's demeanor was caused by intimidation rather than the occasion of his testimony.  It didn't find that the closure was no broader than necessary.  And it didn't find that any measure short of closure would fail.  The closest thing to an explanation is a single aside: "It's kind of hard to cure the perception here." J.A. 203.  Whatever that sentence means, it fails to justify the closure order.[9]  *Cf. Simmons*, 797 F.3d at 411–16 (vacating conviction where court excluded three spectators during a cooperator's testimony due to the prosecutor's concern that the witness "might be

---

[9] It's true that in *Jarvis* we took a pragmatic view of the findings requirement, declining to demand a "particular format" and permitting review of "facts of record which fully support the decision."  236 F.3d at 172–74.  But this portion of *Jarvis* does not help the Majority here for two reasons.  First, its posture: As mentioned earlier, *Jarvis* was federal habeas review of a state conviction, in which we were "mindful of the limited nature of our inquiry."  *Id.* at 166.  This is *de novo* direct review.  Second, *Jarvis* involved a trial judge who held a pretrial hearing on the State's closure motion, made "a particularized determination that closure is appropriate," and "articulated the basic rationale," such that "additional 'findings' would be little more [than] a statement of the obvious."  *Id.* at 155–56, 172–74.  Nothing was obvious here.

31

intimidated," because the court "asked no questions at all" to substantiate that concern and made no findings that the asserted interest was actually at risk).

Any one of these failures warrants vacatur. And since the violation of the public-trial right is structural, Ellis need not show that the closure actually changed anything about the outcome of the trial. *Weaver*, 582 U.S. at 294–95; *United States v. Mallory*, 40 F.4th 166, 175 (4th Cir. 2022). I would thus apply the remedy prescribed by the Supreme Court: vacatur of Ellis's conviction and remand for a new trial.

*          *          *

I acknowledge that retrying a case that the government won convincingly would be a steep remedy for a single hour's closure. And I acknowledge that the evidence does little to suggest that Ellis is a sympathetic figure. But Robert Bolt put the answer in Sir Thomas More's mouth in *A Man for All Seasons*: More would give even the Devil the benefit of law, for the man who cuts down every law to get at the Devil could not stand upright when the winds turned round on him. Robert Bolt, *A Man for All Seasons*, Act I, p. 147 (Three Plays, Heinemann ed. 1967). Ellis was owed a public trial no less than any other defendant. I respectfully dissent.